UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAURICE L. ISAAC,

      Plaintiff,

v.

ANDREW SAUL, COMMISSIONER
OF SOCIAL SECURITY,

      Defendant.

Case No. 2:20-cv-11573
District Judge Arthur J. Tarnow
Magistrate Judge Kimberly G. Altman

_____/

## REPORT AND RECOMMENDTION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

### I.     Introduction

This is a social security case.  Plaintiff Maurice L. Isaac brings this action

under 42 U.S.C. § 405(g), challenging the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application for

Supplemental Security Income ("SSI") under the Social Security Act (the "Act").

Both parties have filed summary judgment motions (ECF Nos. 13, 14), which have

been referred to the undersigned for a Report and Recommendation under 28

U.S.C. § 636(b)(1)(B).

For the reasons set forth below, it is RECOMMENDED that the

Commissioner's Motion for Summary Judgment (ECF No. 14) be DENIED,

1

Isaac's Motion for Summary Judgment (ECF No. 13) be GRANTED IN PART

AND DENIED IN PART and the matter be remanded for further proceedings

under sentence four of 42 U.S.C. § 405(g).

## II.    Background

### A.    Procedural History

Isaac was born on May 28, 1977, making him 39 years old at the time of his

SSI application date of November 28, 2016.  (ECF No. 11, PageID.61).  He

attended a special education curriculum in school, completed eighth grade, and had

prior work experience doing general labor through a temporary staffing service.

(*Id*., PageID.82, 93, 219).  He alleged disability due to sleep apnea, learning

problems, "trachs in throat," gall bladder issues, a feeding tube, high blood

pressure, and asthma.  (*Id*., PageID.218).

After Isaac's SSI application was denied at the initial level on August 24,

2017 (*Id*., PageID.117), he timely requested an administrative hearing, which was

held on April 4, 2019, before the ALJ.  (*Id*., PageID.77-103).  Isaac testified at the

hearing, as did a vocational expert ("VE").  (*Id*.).  On June 5, 2019, the ALJ issued

a written decision finding that Isaac was not disabled during the relevant time

period.  (*Id*., PageID.59-71).  On May 5, 2020, the Appeals Council denied review,

making the ALJ's decision the final decision of the Commissioner.  (*Id*.,

PageID.45-52).  Isaac timely filed for judicial review of the final decision.  (ECF No. 1).

## B.    Medical Evidence

The medical record reflects that on April 17, 2016, Isaac was admitted to St. John Hospital and Medical Center for acute hypoxic/hypercarbic respiratory failure due to obesity, hypoventilation syndrome, and advanced chronic obstructive pulmonary disease (COPD).  (ECF No. 11, PageID.298).  He was also assessed with agitation on Seroquel, a history of hypertension, diastolic and systolic heart dysfunction with an ejection fraction of 40%, and morbid obesity, with a body mass index (BMI) above 40.  (*Id*., PageID.294-295).  Isaac was held overnight and there were complications with weaning him off of sedatives.  (*Id*., PageID.296). He continued to be hospitalized for his condition and on May 4, 2016, a tracheostomy tube was implanted.  (*Id*., PageID.305).  Isaac was discharged on June 28, 2016 with diagnoses of status post vent-dependent respiratory failure, multifactorial, secondary to COPD and morbid obesity; history of hypertension; combined systolic and diastolic heart failure; morbid obesity, BMI over 40; and acute dep vein thrombosis (DVT) in the left popliteal vein.  (*Id*., PageID.373).  In recapping Isaac's hospitalization, the attending clinician noted that he had presented with shortness of breath, which lasted for one day, and that in the ER he became lethargic and sleepy with a respiratory rate in the 40s.  (*Id*.).  He was then

intubated and "had a prolonged hospital course," initially being monitored in the ICU.  (*Id.*).  He was then started on an IV diuresis and Seroquel, which was subsequently increased to the maximum dosage, as well as fentanyl pushes.  (*Id.*).  He was eventually brought to a stable condition and was given a nocturnal ventilator and discharged.  (*Id.*).

Prior to his hospitalization, Isaac was referred by his treating physician Richard R. Hammoud, M.D., to a pulmonary specialist, Elias Sharba, M.D.  (ECF No. 11, PageID.788).  Dr. Sharba found that Isaac suffered from acute hypoxic respiratory failure, having "significant problems including cardiomyopathy, pulmonary hypertension, and morbid obesity."  (*Id.*).  He further found that Isaac would need home oxygen with exertion and during sleep.  (*Id.*).  Isaac also had a history of hypercapnic respiratory failure, history of asthma, morbid obesity, and severe cardiomyopathy.  (*Id.*, PageID.788-789).

On July 17, 2017, Isaac presented to a consultative examiner, Cynthia Shelby-Lane, M.D.  (*Id.*, PageID.857-860).  Dr. Shelby-Lane noted Isaac's diagnoses of sleep apnea, learning problems, history of two tracheostomies and a feeding tube, hypertension, and asthma.  (*Id.*, PageID.859-860).  She opined that Isaac had "frequent limitations with standing, walking, tandem walk, heel walk and toe walk, squatting and bending due to morbid obesity, dyspnea on exertion and shortness of breath," a "wide based gait," and "decreased range of motion in both

knees secondary to morbid obesity." (*Id.*, PageID.860).  His simple grasping and dexterity, both gross and fair, were found to be unimpaired.  (*Id.*).

Later, on September 20, 2017, Isaac was assessed by his treating physician Dr. Hammoud.  (ECF No. 11, PageID.878-880).  In his opinion, Dr. Hammoud noted that Isaac had shortness of breath, weakness, and breathing difficulties, and that Isaac follows up with his primary care physician and takes his prescribed medications regularly.  (*Id.*, PageID.878).  He opined that Isaac could lift and carry less than 20 pounds, could only stand or walk for one hour in an eight-hour day due to his COPD, was not affected in the activity of sitting, did not need to elevate his legs, and would need one-to-two fifteen minute breaks per day.  (*Id.*, PageID.878-879).  Further, he found that Isaac would have about four "bad days" per month on which Isaac would be absent as a result of his impairments.  (*Id.*, PageID.879).  He also found that Isaac could only occasionally (meaning 6% to 33% of an eight-hour day) engage in activities such as twisting, stooping, crouching, climbing ladders or stairs, and looking to the left, right, up, or down. (*Id.*, PageID.880).

On December 17, 2017, Isaac underwent a pulmonary function test administered by Dr. Sharba, which indicated that he had minimal obstructive airway disease that was not reversible, a mildly reduced total lung capacity, and

severe uncorrected diffusion defect.[1]  (ECF No. 11, PageID.886).  Less than a

month later, on January 2, 2018, Isaac was again admitted to the hospital for

shortness of breath.  (*Id.*, PageID.889).  While at the ER he was found to be

hypoxic and hypercarbic and suffered a short convulsion, causing him to require

intubation overnight.  (*Id.*, PageID.899).  He admitted that his BiPAP[2] device had

broken at home.  (*Id.*).  His impressions included respiratory failure; acute

exacerbation of COPD/asthma; CPAP dependency; uncompensated respiratory

acidosis; acute exacerbation of chronic systolic congestive heart failure; severe

pulmonary hypertension; essential hypertension; metabolic encephalopathy;

morbid obesity; and tobacco abuse.  (*Id.*, PageID.908).  He was discharged the

evening of January 7, 2018, five days after being admitted.  (*Id.*, PageID.918).

Isaac had a follow-up appointment with Dr. Sharba on May 6, 2018, during

which he stated that he was now compliant with his BiPAP and using it daily,

which he felt was helping.  (ECF No. 11, PageID.987).  Upon physical

examination, Isaac appeared well and in no distress, with no abnormal findings

other than obesity and slight edema.  (*Id.*, PageID.989).   The records from this

visit were sent to a heart and vascular specialist, Mohamad Sobh, D.O., that Isaac

---

[1] "Diffusion Defects refer to deficiencies in oxygen pulmonary gas exchange that yield abnormally low partial pressures of arterial oxygen." http://www.pathwaymedicine.org/diffusion-defect (last accessed April 20, 2021).
[2] BiPAP is a treatment that uses mild air pressure to keep airways open while an individual sleeps. (ECF No. 11, PageID.931-932).

then saw on March 22, 2018 for an additional hospital follow up.  (*Id*.,
PageID.974).  He presented as doing well generally, denying any chest pain,
dizziness, lightheadedness, leg pain, or edema, but with occasional shortness of
breath and dyspnea on exertion.  (*Id*.).  On examination, his results were entirely
normal.  (*Id*., PageID.976).  He was assessed with moderate to severe pulmonary
hypertension, COPD, shortness of breath, dyspnea on exertion, morbid obesity, and
tobacco and marijuana abuse.  (*Id*.).  His plan was a healthy and restricted diet,
smoking cessation, review of medication, current management, referral to another
doctor for weight loss, and to follow up in three months.  (*Id*., PageID.977).

On September 24, 2018, Isaac was admitted to Ascension St. John Hospital
for shortness of breath and exacerbation of asthma, as well as a cough, though he
denied symptoms of an upper respiratory tract infection.  (*Id*., PageID.1041-1042).
He presented with a two-day worsening of dyspnea and cough, and a chest x-ray
on admission showed subtle changes in the right lung base.  (*Id*.).  On examination,
his cardiovascular results were found to be limited by obesity but otherwise
normal, and the other results were normal as well.  (*Id*., PageID.1044).  His chest
x-ray showed airspace disease in the right lung base, possible pneumonia, and
findings consistent with COPD.  (*Id*., PageID.1045).

Isaac saw Dr. Sharba again on December 4, 2018, with records noting that
his last visit was in March.  (ECF No. 11, PageID.992).  He presented with an

increase in shortness of breath from regular activity, but benefitting from daily use of his BiPAP machine.  (*Id*.).  He reported an increase in swelling and feeling like the BiPAP was not giving him enough air.  (*Id*., PageID.993).  Examination revealed diminished breath sounds likely due to body habitus and chronic edema. (*Id*., PageID.994).  Dr. Sharba noted that Isaac had gained weight, requires BiPAP titration, and has "significant cardiovascular morbidity" that "will need to be treated aggressively to prevent deterioration."  (*Id*., PageID.995).  The same day, Isaac saw Dr. Hammoud for his annual examination, presenting with elevated blood pressure and complaining of "left knee pain for the past few weeks."  (*Id*., PageID.1004).  Isaac denied weight gain, but measured at 5'9" and 480 pounds, with a BMI of 70.88.  (*Id*.).

At the hearing, Isaac testified that he previously did general labor for a "temp service," where he would lift 25-30 pounds at most, but was terminated because he "kept falling asleep on the job."  (ECF No. 11, PageID.82).  He stated that he could not work due to falling asleep three times per day and the swelling of his leg.  (*Id*.).  He must elevate his legs waist high to reduce the swelling, and in addition, stated that he suffers back pain at a level of eight out of ten, but had not had treatment for the back pain beyond Motrin and Naprosyn.  (*Id*., PageID.83). With those medications, the pain is reduced to a five out of ten.  (*Id*.).

Isaac further testified that while he is able to dress and bathe himself, he does not do chores such as laundry, dishwashing, vacuuming, sweeping, making the bed, or taking out the garbage, but he can cook while sitting and do grocery shopping in a motorized cart.  (*Id*., PageID.88-90).  He can walk without stopping for about three to four houses on a given block, can stand for 10 to 15 minutes at a time, can sit for 20 to 30 minutes, and lift 15 to 20 pounds.  (*Id*., PageID.90-91).  He also testified that he can climb stairs but only with a handrail, bend and touch his knees while standing, but has some difficulty using his hands, as they cramp and lock up.  (*Id*.).  Further, Isaac stated that he lays down 40 to 50 minutes per day due to pain, and uses oxygen whenever he moves around, but has been without portable oxygen since July 2018 when his machine was lost in a house fire.  (*Id*., PageID.92-93).  Finally, Isaac reported that he is 5'10" tall and estimated that he weights 430 pounds.  He has discussed bariatric surgery with his doctors but insurance will not cover it.  (ECF No. 11, PageID.84, 94).

### III.     Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  The

Commissioner's regulations provide that a disability is to be determined through

the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or his past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or his past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or his age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D.

Mich. Oct. 31, 2008), citing 20 C.F.R. § 416.920; *see also Heston v. Comm'r of

Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the

claimant throughout the first four steps.... If the analysis reaches the fifth step

without a finding that claimant is not disabled, the burden transfers to the

[Commissioner]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Isaac was not disabled under the Act. At Step One, the ALJ found that Isaac had not engaged in substantial gainful activity since his application date of November 28, 2016. (ECF No. 11, PageID.61). At Step Two, the ALJ found that he had the severe impairments of "Morbid Obesity; Chronic Obstructive Pulmonary Disease (COPD); Asthma; History of Respiratory Failure; Obstructive Sleep Apnea; Pulmonary Hypertension; Congestive Heart Failure; Cardiomyopathy; Tobacco Abuse; History of Tracheostomy in Throat; and History of Learning Disorder." (*Id.*). At Step Three, the ALJ found that Isaac's impairments, whether considered alone or in combination, did not meet or medically equal a listed impairment. (*Id.*, PageID.62-64).

The ALJ then assessed Isaac's residual functional capacity ("RFC"), concluding that he was capable of performing sedentary work as defined in 20 C.F.R. § 416.967(a), with the following additional limitations:

> [Isaac] can occasionally climb ramps or stairs with handrails; he cannot use ladders, ropes, or scaffolds; he can occasionally balance, stoop, and kneel, but he cannot crouch or crawl; he should have no concentrated exposure to fumes, dusts, odors, gases, poorly ventilated areas, or pulmonary irritants; he should have no exposure to hazards, including unprotected heights or the operational control of dangerous moving machinery; he should have no concentrated exposure to extreme cold, heat, or humidity; while sitting, he may alternate the elevation of his

feet, 1 foot at a time, up to 12 inches; he has a 3rd grade reading level; and he would be off task up to 8% of the workday.

(*Id.*, PageID.64).

At Step Four, the ALJ found that Isaac was unable to perform any past relevant work. (*Id.*, PageID.69). At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Isaac was capable of performing the jobs of table worker (3,289 jobs nationally), ticket counter (4,006 jobs nationally), and glass waxer (1,489 jobs nationally). (*Id.*, PageID.70). As a result, the ALJ concluded that Isaac was not disabled under the Act. (*Id.*, PageID.71).

IV.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Although the court, can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one. Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision. *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224–25 (6th Cir. 2019)); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts

of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same).

An ALJ's factual findings must be supported by "substantial evidence." 42 U.S.C. § 405(g). The Supreme Court has recently explained what that term means:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) ("The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154. However, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its

13

own regulations and where that error prejudices a claimant on the merits or

deprives the claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582

F.3d 647, 651 (6th Cir. 2009) (internal quotations omitted). Although the

substantial evidence standard is deferential, it is not trivial. The Court must " 'take

into account whatever in the record fairly detracts from [the] weight' " of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir.

2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court

defers to that finding even if there is substantial evidence in the record that would

have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 406 (internal quotations omitted).

V.    Analysis

A.

Isaac contends that the ALJ erred at step five of the sequential analysis,

claiming specifically that the occupations of table worker, ticket counter, and glass

waxer, which make up 8,784 jobs in the national economy, do not satisfy the

requirement to identify work that exists "in significant numbers either in the region

where such individual lives or in several regions of the country." 42 U.S.C. §

423(d)(2)(A). As noted above, the burden at this step shifts from the claimant to

the Commissioner to show, "if the claimant is unable to perform his or his past

14

relevant work, [that] other work exists in the national economy that the claimant can perform".  20 C.F.R. § 416.920.

"[W]ork which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).  Likewise, under the regulations, "work exists in the national economy when it exists in significant numbers either in the region where [the claimant] live [s] or in several other regions of the country."  20 C.F.R. § 404.1566(a).  There is no bright line boundary separating a "significant number" from insignificant numbers of jobs.  *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988).  What constitutes a significant number of jobs is to be determined on a case-by-case basis.  *Id.*  In making its determination, the court should consider "the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work; and so on."  *Id.; see also Born v. Secretary of Health and Human Servs.,* 923 F.2d 1168, 1174 (6th Cir. 1990).  These factors are suggestions only; the ALJ is not required to explicitly consider each factor.  *Harmon v. Apfel,* 168 F.3d 289, 292 (6th Cir. 1999).  The "decision should ultimately be left to the trial judge's

common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Hall,* 837 F.2d at 275.

Isaac cites *Riser v. Comm'r of Soc. Sec.*, No. 13-11135, 2014 WL 1260127, at *19 (E.D. Mich. Mar. 26, 2014), for the proposition that 8,000 available jobs nationally is not a significant number. In *Riser*, the court stated that the available job numbers of 1,000 in Michigan and 8,000 nationally "undoubtedly border on insignificant." *Id*. The court went on to state:

> Courts have found that quantities greater than 8,000 jobs nationally are insignificant. *See Valencia v. Astrue,* No. 11–06223, 2013 WL 1209353, at *18 (N.D. Cal. Mar. 25, 2013) ("114 regional or <u>14,082 national positions</u> does not constitute a significant number as defined in 42 U.S.C. § 423(d)(2) (A)."); *West v. Chater,* No. C–1–95–739, 1997 WL 764507, at *3 (S.D. Ohio Aug. 21, 1997) ("In this case, the Court finds as a matter of law that 100 jobs locally, 1,200 jobs statewide and <u>45,000 jobs nationally</u> do not constitute a significant number of jobs under 42 U.S.C. § 423(d)(2)(a)."); *Tapp v. Sec'y of Health & Human Servs.,* No. 1:90CV1214, 1991 WL 426310, at *1 (N.D. Ohio July 18, 1991) (<u>finding 30,000 jobs nationally insignificant</u>).

*Id*. (emphasis on national numbers added throughout). The *Riser* court went on to uphold the ALJ's decision, but solely based on the fact that 1,000 jobs in Michigan met the significant number standard, based on case law pertaining to the number of jobs available locally. *Id*.

Going out of circuit, Isaac also cites *Mize v. Saul*, No. 2:18-CV-03202-AC, 2020 WL 528850, at *5 (E.D. Cal. Feb. 3, 2020), a case providing a recent summary of the state of Ninth Circuit case law on this topic. The *Mise* court noted

that while 25,000 jobs nationally has been found to be significant (citing *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014)), this was a "close call," and "[t]he Ninth Circuit has yet to endorse a number below 25,000 as significant within the meaning of the statute." *Id*. The court noted that the Ninth Circuit had more recently rejected 5,000 jobs, 10,000 jobs, and even 18,500 jobs nationally as "likely insignificant" numbers. *Id*. (citing cases). Ultimately, the *Mise* court ordered remand where the vocational expert had identified only 8,233 jobs in the national economy that the claimant could perform, a number similar to that of Isaac's.

The Commissioner responds, citing *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016), in which the Sixth Circuit stated that "[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed "significant.' " What follows in *Taskila* is a string citation of cases purported to support 2,000, 1,000, 500, and 1,266 jobs as work existing in significant numbers. *Id*. However, in doing so, the *Taskila* court appears to have overlooked a key fact that at least one other court has recognized:[3] the job numbers from every cited case except one referred to *regional*, not *national*, numbers. *See id.* (citing *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (referring to 1,000

---

[3] *See James A. v. Saul*, 471 F. Supp. 3d 856, 859, n.1 (N.D. Ind. 2020) ("*Taskila* relies, at least in part, on a misunderstanding that the 1,000 jobs discussed in *Liskowitz* was the national economy number.")

jobs in a regional area); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988)

(500 jobs regionally); *Barker v. Secretary of Health and Human Services,* 882 F.2d

1474, 1479 (9th Cir. 1989) (1,266 jobs regionally)).  Thus, for the part of the

*Taskila* court's holding relying entirely on other caselaw, the court interpreted

three of the four cited cases incorrectly.

The case that *Taskila* correctly relied upon, which stated that 2,000 *national*

jobs was a significant number, was the only Sixth Circuit case cited, *Nejat v.

Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009).  But *Nejat* appears to

have committed the same error, relying on similar local, regional, or state-wide job

totals from five other cases to support its conclusion that 2,000 jobs *nationally* is a

significant number.  *See id.* (citing *Mickelson-Wurm v. Comm'r Soc. Sec. Admin.*,

285 F. App'x 482, 487 (9th Cir. 2008) (2,000 jobs in Oregon were significant);

*Born v. Sec'y of Health & Hum. Servs.*, 923 F.2d 1168, 1175 (6th Cir. 1990) (2,500

jobs regionally); *Barker*, 882 F.2d at 1479 (1,266 jobs regionally); *Jenkins*, 861

F.2d at 1087 (500 jobs regionally); *Hall*, 837 F.2d at 275 (1350 jobs in the local

economy)).  Not one of the cases relied upon as precedent in *Nejat* referred to

national numbers.  Thus, the conclusions from *Nejat* and *Taskila* – that 2,000 jobs

and 6,000 jobs in the national economy are significant – are not persuasive.

Significantly, neither of those conclusions are binding, as "the significant-numbers

inquiry [is] a fact question reviewed for substantial evidence." *Taskila.*, 819 F.3d at

905.  And again, what constitutes a significant number of jobs is to be determined on a case-by-case basis.  *Hall*, 837 F.2d at 275.

In addition to *Riser* and the Sixth Circuit cases cited therein, a number of other district courts within our circuit have found similar or larger numbers than those here to be potentially insignificant.  *See Troyer v. Comm'r of Soc. Sec.*, No. 1:12CV759, 2013 WL 4954883, at *5 (W.D. Mich. Sept. 12, 2013) ("For this Court to conclude that 1,000 jobs in the state of Michigan (and 33,000 jobs nationally) constitutes a significant number would require the type of fact-finding that the Court is expressly precluded from performing."); *Smathers v. Comm'r of Soc. Sec.*, No. 2:14-CV-500, 2015 WL 401017, at *5 (S.D. Ohio Jan. 28, 2015), *report and recommendation adopted,* No. 2:14-CV-500, 2015 WL 5568324 (S.D. Ohio Sept. 22, 2015) (requiring remand because 8,250 jobs nationally may be insignificant); *Malone v. Astrue*, No. 3:10–CV–01137, 2012 WL 1078932, at *6 (M.D.Tenn. Mar. 30, 2012) (finding that 239 regional jobs and 16,900 jobs were not significant); *Mackins v. Astrue*, 655 F. Supp. 2d 770 (W.D. Ky. 2009) (900 copy machine operator jobs in the state, or 60,000 jobs in the nation, did not represent a significant number of jobs in the national economy.).  Circuit courts outside of the Sixth Circuit have reached similar conclusions regarding the number of national jobs necessary to be considered significant.  The Eighth Circuit, for example, has found that 10,000 jobs in the national economy is significant.  *See*

*Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997).  This particular finding has been cited favorably by many courts there and in other circuits.  *See, e.g.*, *Griffin v. Saul*, 2019 WL 8499518, at *7 (N.D. Iowa Nov. 21, 2019), *report and recommendation adopted sub nom. Griffin v. Comm'r of Soc. Sec.*, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020) (citing *Johnson* approvingly while declining to follow *Taskila* in concluding that 7,800 jobs is insignificant); *Young v. Astrue*, 519 F. App'x 769, 772 (3d Cir. 2013) (concluding that 20,000 national jobs is significant, relying in part on *Johnson*); *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (finding 25,000 national jobs to be significant while noting that *Johnson* sustained such a finding based on 10,000 national jobs); *Riser*, at *19.

In the Seventh Circuit, the state of the significant-numbers inquiry was recently summarized in *John C. v. Saul*, 2021 WL 794780, at *5 (C.D. Ill. Mar. 2, 2021), in which the court found that only one district court case in that circuit found a number lower than 20,000 national jobs (the number being 17,100, specifically) was significant, and that other district courts had found numbers as high as 120,350 national jobs to be insignificant.  In *John C.*, the court emphasized that it is the Commissioner's burden to show that the claimant can "perform jobs existing in significant numbers in the national economy," and that without binding authority to suggest that 20,000 jobs were significant, and with district courts'

conclusions varying to such a degree, the Commissioner had failed to persuade the court that 20,000 was a significant number. *Id*.

In the Tenth Circuit, the determination that a "significant number" of jobs are available to the claimant must be supported by "a claimant-specific, factual analysis - unless so many jobs are identified that such an analysis is rendered unnecessary as a matter of law (at least 152,000 jobs in the Tenth Circuit)." *Halford v. Saul*, No. CV 19-0413 JHR, 2020 WL 3832986, at *1 (D.N.M. July 7, 2020) (citing nine of the court's prior opinions). The factors to be considered are the same as those outlined in *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988). *See Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992). But one Tenth Circuit case has found that this analysis was not necessary where only 20,500 to 22,000 jobs were identified in the national economy. *Garcia v. Comm'r, SSA*, 817 F. App'x 640, 650 (10th Cir. 2020). The Eleventh Circuit has found that 23,800 jobs in the national economy met the significant number requirement, with little analysis. *Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 935 (11th Cir. 2015).

In light of the above, the Commissioner has failed to satisfy the burden that "other work exists in the national economy that [Isaac] can perform". 20 C.F.R. § 416.920. There is little support for the contention that 8,784 total jobs in the national economy is a significant number. That number equates to an average of

about 176 jobs per state, which assumes that there are an equal number of each of the three identified jobs in each state and that each state has such jobs. And given Isaac's impairments and the highly restrictive RFC crafted by the ALJ, the lack of analysis provided by the ALJ on any of the *Hall v. Bowen* factors, or any other factors, provides nothing for this Court to review in concluding whether this decision was based on substantial evidence. The Commissioner has responded only with *Taskila*. As explained above, however, every case relied upon by *Taskila* to reach that conclusion was either referring to local and regional job numbers, or basing *its* conclusion on cases doing the same. Moreover, the significant number of jobs inquiry is case specific. Thus, the undersigned finds that the Commissioner has not satisfied its step five burden, and recommends that the case be remanded for further analysis of whether the available jobs exist in significant numbers to Isaac.

## B.

Isaac also argues that the ALJ's RFC is not supported by substantial evidence, largely on the basis of the ALJ's treatment of treating physician Dr. Hammoud's medical opinion, and contending that the ALJ did not rely on a medical opinion to formulate the RFC. The Commissioner responds that the ALJ is responsible for the RFC and not required to base it on a medical opinion, and that the opinion evidence including that from Dr. Hammoud was treated properly.

22

In light of the recommendation for remand above, it is not necessary to reach these issues. However, the undersigned will consider these issues for the sake of completeness. As will be explained, neither issue independently supports a remand.

Isaac argues that the ALJ violated the treating physician rule by not giving Dr. Hammoud's September 2017 medical opinion controlling weight, and failing to give good reasons for doing so. For claims filed before March 27, 2017, such as Isaac's, an ALJ must give the medical opinion of a claimant's treating physician controlling weight as long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record (the "treating physician rule"). 20 C.F.R. § 416.927(c)(2); *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). While controlling weight may be given to medical opinion evidence such as "the nature and severity of an individual's impairment(s)," controlling weight may not be given to "administrative findings that are dispositive of a case"—for example, what an individual's residual functional capacity is or whether an individual is disabled. Soc. Sec. Rul. 96-5p, 1996 WL 374183, at *2 (July 2, 1996); 20 C.F.R. § 416.927(d); *see also Warner*, 375 F.3d at 390 ("The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician." (alterations adopted) (quoting *Harris v. Heckler*, 756 F.2d

23

431, 435 (6th Cir. 1985))).  Furthermore, controlling weight may not be given to an opinion "unless it also is 'not inconsistent' with the other substantial evidence in the case record."  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *1 (July 2, 1996).

If the ALJ decides not to give the treating physician's medical opinion controlling weight, he must determine what weight to give it by looking at "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley*, 581 F.3d at 406; 20 C.F.R. § 416.927(c).  The ALJ is required to "always give good reasons in [the] notice of determination or decision for the weight" of the "treating source's medical opinion" (the "good reasons requirement").  20 C.F.R. § 416.927(c)(2); *see also* Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *7 (July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").  These reasons must be specific in order to "make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

In declining to give controlling weight to Dr. Hammoud's opinion, the ALJ still gave some weight to his statements.  (ECF No. 11, PageID.69).  The ALJ

found Dr. Hammoud's opinion that Isaac could lift and carry less than 20 pounds to be supported by the record, and accounted for this by limiting Isaac to sedentary work.  (*Id*.).  But the ALJ found that Dr. Hammoud did not provide sufficient support for other assertions, such as the limitation of standing and walking for one hour out of an eight-hour day, needing one to two unscheduled breaks per day, being absent from work four days per month, and being only occasionally able to "look down, turn his head, look up, hold his head in a static position, twist, stoop, crouch/squat, climb ladders, and climb stairs."  (*Id*.).  Dr. Hammoud gave no support for these findings in the opinion itself, other than that the standing and walking restriction is supported by Isaac's "[diagnosis] of COPD."  (*Id*., PageID.879).  And the ALJ accurately noted that Isaac's condition improved with medication compliance, including use of his BiPAP machine, and that later evidence often showed "unremarkable to mild findings, including intermittent shortness of breath and mild edema."  (*Id*., PageID.69).  Further, Isaac testified that he can dress and bathe himself, walk without stopping for about three to four houses on a given block, and stand for 10 to 15 minutes at a time.  (*Id*., PageID.88-91).  The August 2017 state agency consultant opinion of Sonia Ramirez-Jacobs, M.D., also supports the ALJ, as Dr. Ramirez-Jacobs opined that based on the evidence of record at that time, Isaac could stand or walk for two hours of the work day, consistent with sedentary work.  (*Id*., PageID.111).

25

Isaac argues that Dr. Hammoud's specific findings on standing and walking and unscheduled breaks are supported by the record.  He notes that these findings are consistent with his diagnoses of COPD and chronic asthma.  But a diagnosis "says nothing about the severity of the condition."  *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).  He also argues that the findings are consistent with those of Dr. Shelby-Lane, who found Isaac limited by shortness of breath and dyspnea on exertion, affecting his tandem walking, heel walking, and toe walking.  The ALJ discounted these findings for the same reasons as Dr. Hammoud's, and found support for this decision throughout the record and in the opinion of Dr. Ramirez-Jacobs.  (ECF No. 11, PageID.68).  Additionally, as the Commissioner notes, Dr. Shelby-Lane assessed Isaac with "frequent limitations" in standing and walking, meaning that Isaac would be limited in those activities for one-third to two-thirds of the day.  (ECF No. 14, PageID.1077, citing ECF No. 11, PageID.860).  This supports the ALJ's contention that Isaac can stand or walk for two out of eight hours of the day.

Isaac also points to his pulmonary stress test results in support of Dr. Hammoud's opinion, inviting the Court to interpret raw medical data in a manner that even the ALJ is prohibited in exercising.  *See, e.g., Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015); *VanWormer v. Comm'r of Soc. Sec.*, No. 16-CV-12978, 2017 WL 4230654, at *2 (E.D. Mich. Sept. 25, 2017).  Dr.

Hammoud did not cite these test results in assessing any of Isaac's impairments, which may be part of the reason the ALJ discounted them as lacking "sufficient support." (ECF No. 11, PageID.69). It is beyond the Court's and the ALJ's expertise or ability to declare, for instance, whether Isaac's requirement of "3 liters of oxygen by nasal cannula to maintain saturation with ambulation" (ECF No. 13, PageID.1058) supports a finding that Isaac can stand or walk for one hour per day and requires one to two breaks per day, or whether this allows for Isaac to stand and walk for two hours per day and remain on task for at least 92% of the day, as allowed by the RFC.

An ALJ may decline granting controlling weight to a treating physician's opinion if it is inconsistent with substantial evidence in the record. 20 C.F.R. § 416.927(c)(2). Then, the ALJ must assign some weight to the opinion and give "good reasons" for doing so. *Id*. Supportability and consistency with the record are two of the factors an ALJ may use to determine the weight given to an opinion. 20 C.F.R. § 416.927(c)(3) and (4). Here, the ALJ has properly noted the record evidence that is inconsistent with Dr. Hammoud's opinion, and that the opinion lacks supporting reasoning. (ECF No. 11, PageID.69). Isaac has shown that some evidence also supports Dr. Hammoud's findings. But "the standard on review is to determine if substantial evidence supports the ALJ's conclusion.... The fact that a record may also possess substantial evidence to support a different conclusion than

27

that reached by the ALJ or that a reviewing judge might have decided the case differently is irrelevant." *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). *See also Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."). Therefore, the Court finds no reversible error in the ALJ's treatment of Dr. Hammoud's opinion evidence, and no violation of the treating physician rule.

Isaac's remaining attack on the ALJ's substantial evidence in support of the RFC amounts to an argument that the RFC was not based on medical opinion evidence, noting that "it is the rare case in which the ALJ can formulate a residual functional capacity assessment without relying, at least in part, on an assessment by a medical professional..." *Williams v. Berryhill*, No. 2:18-CV-10052, 2019 WL 1274821, at *3 (E.D. Mich. Mar. 20, 2019). Isaac also contends that the capacity to address his leg swelling by alternating elevation of each leg up to 12 inches off of the ground, and being off-task for no more than 8% of the work day, are unsupported by substantial evidence.

The ALJ accurately noted that Isaac displayed slight edema of the extremities at times, and had swelling of lower extremities that was treated with a diuretic, but also that at other times his extremities appeared normal. (ECF No. 11,

PageID.65).  The ALJ also considered Isaac's testimony that he has to elevate his legs to waist level approximately three times per day for 15 minutes each time. (*Id.*, PageID.66).  But Isaac's subjective statements concerning the limiting effects of his symptoms were found to be "not entirely consistent" with the evidence, a finding that Isaac does not challenge.  (*Id.*, PageID.67).  *See Potter v. Colvin*, No. 3:12-CV-202, 2013 WL 4857731, at *14 (E.D. Tenn. Sept. 11, 2013) "In any event, the Plaintiff did not raise this aspect of the ALJ's credibility assessment, and therefore, it is waived." (citing *Humphrey v. U.S. Att'y Gen's Office,* 279 F. App'x 328, 331 (6th Cir. 2008)).

The ALJ referenced the restriction of elevating each leg 12 inches, as well as the finding that Isaac would be off task only 8% of the day, when discussing the opinion of Dr. Shelby-Lane, noting that he only gave that opinion some weight due to mild clinical and objective findings, including intermittent shortness of breath and mild edema.  (ECF No. 11, PageID.68).  Isaac is correct that there is no opinion or other evidence that he needs to elevate his legs only 12 inches at a time, but Isaac also points to no objective evidence that he needs to elevate his legs higher or more often than this.  In fact, as the Commissioner points out, the questionnaire filled out by Dr. Hammoud specifically inquired about leg elevation, and Dr. Hammoud did not opine that leg elevation was required.  (ECF No. 14, PageID.1083, citing ECF No. 11, PageID.879).  Isaac cites to the Mayo Clinic

webpage for evidence "the following may help decrease edema," including "hold[ing] the swollen part of your body above the level of your heart several times a day."  (ECF No. 13, PageID.1060-1061, citing www.mayoclinic.org/ diseases-conditions/edema).  But this generic and limited statement is of no value when Isaac cannot point to a single instance of any treater or opinion evidence suggesting leg elevation.  Thus, the Commissioner is correct that the RFC is more restrictive in this regard than any of the opinion evidence.  *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Jackson v. Comm'r of Soc. Sec*., No. 16-13032, 2017 WL 4985644, at *8 (E.D. Mich. July 26, 2017) (explaining that the ALJ's more restrictive RFC works in the plaintiff's favor and does not warrant remand), *adopted*, 2017 WL 4296609 (E.D. Mich. Sept. 28, 2017).

Similarly, the only evidence offered by Isaac to challenge the ALJ's determination that he will only be off task up to 8% of the workday is Isaac's own testimony and the number of breaks that Dr. Hammoud opined Isaac would need. (ECF No. 13, PageID.1062).  Having addressed the sufficiency of the ALJ's treatment of Dr. Hammoud's opinion, and having noted that the ALJ's subjective symptom evaluation was not challenged by Isaac, there is no other evidence to consider suggesting that Isaac will be off task more than 8% of the day.  As the

Commissioner notes, it is the claimant who bears the burden of demonstrating the need for a more restrictive RFC. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008); 20 C.F.R. § 416.945(a)(3).

C.

Here, Isaac has not met the burden of showing that the RFC was not based on substantial evidence. Therefore, remand on this basis is not warranted.

However, due to the lack of jobs in significant numbers at step five of the sequential analysis, the undersigned recommends remand for the ALJ to consider whether the relatively small number of jobs available to Isaac in the national economy is a significant number, using a claimant-specific, factual analysis as outlined in *Hall v. Bowen,* 837 F.2d 272 (6th Cir. 1988). On remand, the ALJ is free to reassess the evidence of record as he or she sees fit within the Social Security guidelines.

VI.   Conclusion

For the reasons set forth above, it is RECOMMENDED that Isaac's motion be GRANTED IN PART AND DENIED IN PART, the Commissioner's motion be DENIED, and that this matter be REMANDED for further consideration under sentence four of 42 U.S.C. § 405(g) in accordance with this opinion.

Dated: April 29, 2021           s/Kimberly G. Altman
Detroit, Michigan            KIMBERLY G. ALTMAN
                                 United States Magistrate Judge

## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Isaac v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of
record and any unrepresented parties via the Court's ECF System to their
respective email or First Class U.S. mail addresses disclosed on the Notice of
Electronic Filing on April 29, 2021.


s/Marie E. Verlinde
MARIE E. VERLINDE
Case Manager